Jeffrey POKORNY, Plaintiff,

v.

Douglas M. COSTLE, Administrator of the Environmental Protection Agency, Defendant,

and

The City of Schuyler, Nebraska, a Municipal Corporation, Defendant-Intervenor.

Civil No. 78-0-474.

United States District Court, D. Nebraska.

Feb. 2, 1979.

Martin A. Cannon and Mary Cannon Veed, Omaha, Neb., for plaintiff.

David A. Kubichek, Asst. U. S. Atty., Omaha, Neb., D. Nebraska, Jane B. Werholtz, Environmental Protection Agency, Region VII, Kansas City, Mo., for Costle.

Larry E. Welch, Omaha, Neb., Donn K. Bieber and George E. McNally, Schuyler, Neb., for City of Schuyler.

## MEMORANDUM

DENNEY, District Judge.

The present mayor of Schuyler, Nebraska, seeks to restrain certain named defendants from proceeding with the construction of a new wastewater treatment system. Alleging that the Environmental Protection Agency's decision to refrain from preparing an environmental impact statement was unreasonable, the plaintiff desires to obtain an injunction pending a thorough evaluation of the project's impact on the surrounding area. Because of various time restraints, the Court advanced the trial upon the merits and consolidated the prayer for permanent relief with the hearing on the plaintiff's application for a preliminary injunction. After reviewing the record and considering the oral arguments of counsel, the Court concludes that equitable relief is inappropriate. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the following findings of fact and conclusions of law support this conclusion.

The city of Schuyler's existing wastewater treatment system consists of a dual cell lagoon which ultimately discharges treated effluent into Lost Creek, a minor left bank tributary of the Platte River. As required by the Federal Water Pollution Control Amendments of 1972, the city obtained a discharge permit from the Nebraska Department of Environmental Control. This permit allowed the temporary release of wastewater into Lost Creek pending the construction of an updated treatment facility in accordance with a compliance schedule.

The proposed wastewater facility that is the subject of this litigation is the product of the city of Schuyler's efforts to meet an amended compliance schedule. In order to meet the deadline, the city initiated efforts to obtain federal grant construction money from the Environmental Protection Agency. In conjunction with these efforts, the city retained the engineering firm of Kirkham, Michael and Associates to prepare a facility plan as required by EPA regulations. 40 C.F.R. § 35.920 (1977). By April of 1976, Kirkham, Michael had completed a facility plan which included, *inter alia,* a description of current economic, demographic, land use and enviromental conditions in the Schuyler area, a description of the existing wastewater treatment facility, a forecast of future land use and population trends in the area, assessments of the cost effectiveness and the environmental impacts of several possible alternative means of achieving compliance with discharge limits, and an

environmental analysis of the particular treatment alternative selected. On the basis of a consideration of all of these factors, the facility plan concluded that a land application system best served the city's needs. The recommended system involves the construction of two new lagoons for the treatment and storage of wastewater. During the growing season, treated wastewater would be applied to an alfalfa field by a center pivot irrigation system. This arrangement would serve two environmentally laudatory purposes: the nutrients within the wastewater would be recycled, and effluent would no longer be discharged into Lost Creek.

Following the preparation of the facility plan and the selection of the land application alternative, the Environmental Protection Agency was notified. Upon receipt of the plan, the EPA conducted an environmental review in order to determine whether an impact statement was required prior to the disbursement of grant money for the project. That review found no significant environmental impacts associated with the proposed land application system. Accordingly, the Environmental Protection Agency issued a negative declaration. Accompanying that negative declaration was an environmental impact appraisal which briefly described the proposed project, feasible alternatives, the environmental impacts of the proposed action, and the reasons for concluding that there would be no significant environmental impacts. Subsequently, as a result of the selection of an alternative site on the south side of Lost Creek, the EPA issued an amendment to the original negative declaration. In this declaration, dated December 22, 1976, the Environmental Protection Agency concluded that the construction of the proposed facility on the new site offered no greater environmental impacts than those associated with the original location on the north side of Lost Creek. Accordingly, the EPA reaffirmed its original decision to refrain from preparing an environmental impact statement.

Prior to addressing the plaintiff's allegations of defects in the decision of the EPA, the Court must confront a number of threshold questions. No meaningful evaluation of the evidence can take place in the absence of clearly established standards of review and firm legal guidelines.

*Principles of Judicial Review*

■ Under the National Environmental Policy Act of 1969 and the regulations promulgated thereunder, the decision-making agency is entrusted with the task of making the threshold determination of the need for an environmental impact statement. 40 C.F.R. § 6.200 *et seq.* (1977); *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314, 1319 (8th Cir. 1974); *Hanly v. Mitchell,* 460 F.2d 640, 644 (2d Cir. 1972), *cert. denied* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). The standard of review of a threshold decision to issue a negative declaration rather than prepare an impact statement varies from jurisdiction to jurisdiction. *See Peltz & Weinman, NEPA Threshold Determinations: A Framework of Analysis,* 31 Miami L.Rev. 71, 81–87 (1976); *Note, Threshold Determinations under Section 102(2)(C) of NEPA: The Case for "Reasonableness" as a Standard for Judicial Review,* 16 Wm. & Mary L.Rev. 107, 117–26 (1974). Within the Eighth Circuit, the standard for judicial review is one of "reasonableness." *Minnesota Public Interest Research Group v. Butz,* 498 F.2d at 1320; *Monarch Chemical Works, Inc. v. Exon,* 452 F.Supp. 493, 500 (D.Neb.1978); *Sierra Club v. Cavanaugh,* 447 F.Supp. 427, 431 (D.S.D.1978); *Patterson v. Exon,* 415 F.Supp. 1276, 1281 (D.Neb.1976). This standard of review is more rigorous than the narrower tests adopted by other federal courts. Illustrative are several appellate court decisions where trial court reviews of negative declarations were overturned because of the application of an "arbitrary and capricious" standard rather than one of reasonableness. *See, e. g., Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244, 1248–49 (10th Cir. 1973); *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 465 (5th Cir. 1973).

The adoption of a certain standard of review does not answer the problem of allocation of the burden of proof in negative declaration controversies. Courts that have faced the problem place the initial burden of demonstrating the existence of "substantial environmental issues" on the plaintiff. *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 425 (5th Cir. 1973); *Hiatt Grain & Feed, Inc. v. Bergland,* 446 F.Supp. 457, 490 (N.D.Ill.1978). The plaintiff's obligation is satisfied if a deficiency in the administrative record can be established. Once this has occurred,

> the burden will shift, as a general rule, to the federal agency which possesses the labor, public resources and expertise to make the proper environmental assessment and to support it by a preponderance of the evidence. *Simmans v. Grant,* 370 F.Supp. 5, 12 (S.D.Tex.1974).

Closely coupled with the burden of proof question is the propriety of considering evidence outside of a deficient administrative record. Judicial adoption of a searching standard of review does not mean that a federal court's equitable power should always be invoked when an agency fails to adequately address all of the environmental impacts of a major federal action in a negative declaration or an environmental impact appraisal. Upon a prima facie demonstration of an incomplete development of a written record by a federal agency, extrinsic evidence may be considered in a judicial evaluation of the reasonableness of an administrative decision to issue a negative declaration. *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d at 425; *Save Our Ten Acres v. Kreger,* 472 F.2d at 467; *Mid-Shiawassee County Concerned Citizens v. Train,* 408 F.Supp. 650, 654 (E.D.Mich.1976), aff'd 559 F.2d 1220 (6th Cir. 1977); *Jones v. HUD,* 390 F.Supp. 579, 591 (E.D.La.1974).

Before a federal court can decide upon the propriety of considering extrinsic evidence, a definition of the scope of an administrative record must be framed. The concept appears to be a narrow one. The Environmental Protection Agency requires that only a negative declaration and an environmental impact appraisal be prepared and circulated if a project is found to have no significant impact. The Court concludes that, at the very least, the EPA is required to establish a reviewable administrative record in accordance with the following regulations set forth at 40 C.F.R. § 6.212 (1977):

(a) *General.* When an environmental review indicates there will be no significant impact or significant adverse impacts have been eliminated by making changes in the project, the responsible official shall prepare a negative declaration to allow public review of this decision . . .

.   .   .   .   .

(b) *Specific actions.* The responsible official shall take the following specific actions on those projects for which both a negative declaration and an impact appraisal will be prepared:

(1) *Negative declaration.* (i) Prepare a negative declaration immediately after the environmental review. This document shall briefly summarize the purpose of the project, its location, the nature and extent of the land use changes related to the project, and the major primary and secondary impacts of the project.

.   .   .   .   .

(2) *Environmental impact appraisal.* (i) Prepare an environmental impact appraisal concurrently with the negative declaration. This document shall briefly describe the proposed action and feasible alternatives, environmental impacts of the proposed action, unavoidable adverse impacts of the proposed action, the relationship between short term uses of man's environment and the maintenance and enhancement of long term productivity, steps to minimize harm to the environment, irreversible and irretrievable commitments of resources to implement the action, comments and consultations on the project, and reasons for concluding there will be no significant impacts.

If a plaintiff demonstrates the existence of "substantial environmental issues" because of a deficiency in the negative decla-

ration or impact appraisal, a court may consider evidence outside of that narrow administrative record in its review of the reasonableness of the decision to proceed with the project without filing a formal impact statement.

Although an administrative record must be prepared by the responsible official whether a project is adjudged to have either significant or insignificant environmental impacts, a comparison of the relative requirements is helpful in an understanding of the present case. The preparation of an EIS is often a long and complex task that demands a detailed evaluation of environmentally significant impacts in accordance with a statutory outline. In contrast, the Code of Federal Regulations only requires brief descriptions of the project and its environmental consequences when a negative declaration is issued. The policy behind requiring a succinct evaluation of a project's environmental impacts rather than a detailed statement is related to the degree of significance. Environmental protection would not be served by requiring an EIS when a project is insignificant within the meaning of NEPA. The time that the preparation of a full-blown impact statement demands is out of proportion to the environmental risks that exist. If a project's impacts are insignificant, the efforts of the government can focus upon the completion of proposed actions rather than the preparation of documents that serve no useful purpose.

■ A final principle of review in negative declaration cases should be stressed. A reviewing court should confine its inquiry to whether a federal agency has reasonably concluded that a project has no significant adverse environmental impacts, and not whether such adverse effects actually exist. *City of Davis v. Coleman,* 521 F.2d 661, 673 (9th Cir. 1975); *Friends of Yosemite v. Frizzell,* 420 F.Supp. 390, 395 (N.D.Cal.1976). If neither EPA nor the engineering firm that prepared the facility plans considered a substantial environmental issue prior to the time of the issuance of the negative declaration, the Court is precluded from con-

sidering evidence on that issue in an evaluation of the reasonableness of the agency's decision. Of course, such evidence could be considered in a determination of whether an environmental plaintiff has demonstrated a deficiency in an administrative record of sufficient significance to warrant the shifting of the burden of proof.

■ Despite the existence of temporal limitations on the consideration of evidence on the issue of a decision's reasonableness, no such restrictions impinge upon the character of admissible evidence. Physical exhibits, oral testimony and other substantive evidence can be referred to in the judicial review of the propriety of issuing a negative declaration. *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d at 425; *Save Our Ten Acres v. Kreger,* 472 F.2d at 467; *Jones v. HUD,* 390 F.Supp. at 591. If such extrinsic evidence demonstrates that the agency did in fact consider the environmental concerns now brought forth by the plaintiff, the administrative decision is not unreasonable *per se* solely because of the lack of formal discussion. *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d at 426; *First National Bank of Homestead v. Watson,* 363 F.Supp. 466, 474 (D.D.C.1973).

*Reasonableness of Negative Declaration*

■ The decision of the EPA to refrain from filing an EIS on Schuyler's new wastewater treatment system is allegedly deficient in several different respects. The plaintiff's initial complaint relates to the EPA's failure to consider the possibility of locating the treatment plant out of the 100 year floodplain of the Platte River. Alleging that the original site north of Lost Creek and the presently proposed location across the stream to the south are both within the parameters of the Platte's one percent flood line, the plaintiff seeks injunctive relief pending an evaluation of potential locations outside of the path of future floods.

The original facility plan considered the possibility of a regional solution to the pollution problem, the implications of taking no action, and the feasibility of four differ-

ent approaches to the effluent treatment problem. Each of the four alternatives would require a different location of the lagoons or a different layout concept.

The Court believes that the failure of the facility plan to consider plant locations outside of the Platte River 100 year floodplain does not warrant an exercise of equitable relief. The decision to locate the two new effluent cells adjacent to Lost Creek and within the Platte River floodplain was made after a good faith evaluation of the feasible alternatives available. The plans for the new treatment facility reveal that the presently existing wastewater treatment cells are to be used in conjunction with the two new lagoons. All four cells are integrally related in the new land application system. The desirability of keeping all of these cells in the same general location is obvious from a financial viewpoint. Confining odor problems to as small an area as possible also constitutes sound planning.

Furthermore, the plaintiff has failed to demonstrate the existence of any significant adverse impacts that might result from the construction of these cells in the floodplain of the Platte River. Although the height of the dikes surrounding the proposed lagoons were originally designed to withstand a lower projected 100 year flood level than the 1343 foot estimate presently accepted as accurate by the Corps of Engineers, the evidence adduced at trial clearly demonstrates that the engineers anticipated the problem and took steps to mitigate the potentially significant environmental impacts. The present plans call for a dike that rises a full fifty-four inches above the maximum flood stage of the Platte River. The Court further notes that consultation with the Corps of Engineers, which is required before construction in a flood plain can commence, did not result in the raising of any objections to the sufficiency of the protective measures designed into the project by Kirkham, Michael and Associates.

Nor is any significant adverse impact attributable to the location of the two wastewater cells on the south side of Lost Creek rather than on the slightly higher ground contemplated in the original facility plan. As previously pointed out, the proposed dikes are high enough to withstand Platte River flood waters. The change in the location of the cells, which was attributable to land acquisition problems and a desire to streamline the project design, is taken into account in the system design. The engineers recognized the potential problem, and took steps to minimize the potential harm.

The tendency of the Platte River to "pirate" the channel of Lost Creek during floods of lesser magnitude than those occurring once a century has been demonstrated by the evidence. However, the Court can discern no environmental impacts in the "pirating" situation of greater significance than those associated with the Platte's 100 year floods. Overtopping of the protective dikes is not a problem. Moreover, a levee has recently been constructed upon the north bank of the Platte River to prevent the "pirating" of the Lost Creek channel in times of high water. The possibility that the Platte might change its course and divert part or all of its waters into a tributary that is lower in elevation in this area of the watershed is lessened by the construction of the north bank levee. While the levee, which was designed to withstand 10 year floods with freeboard to spare, was built to protect the city of Schuyler rather than the proposed lagoons, the fact remains that waters which might have come down Lost Creek in a flood of lesser proportions than the 100 year prediction for the Platte River crest are now subject to diversion.

The failure of EPA or the engineers who drew up the facility plan to consider the environmental effects of a flood on Lost Creek itself is also raised by the plaintiff. The lack of study is acknowledged by the EPA. No evaluation of the flood hazard from Lost Creek appears in the administrative record. The reason for the omission initially appears to be attributable to the lack of a significant environmental threat from such a source. No records adduced at trial suggest that Lost Creek has ever flooded independently of the Platte.

Some evidence presented by the defendants suggests that the threat of harm from a Lost Creek flood is not entirely remote and speculative. However, this evidence centers around recent Corps of Engineers computations of the 100 year crest of a Lost Creek flood. These figures were unavailable and were not considered by the EPA prior to the issuance of the negative declaration, and are not to be considered in the evaluation of the reasonableness of the agency's decision. Despite this stricture upon a federal court's ability to evaluate evidence, it seems rational to refer to this type of proof in a determination of the existence of "substantial environmental issues." In this manner, a reviewing court can determine whether the failure of an administrative agency to consider an issue is due to an oversight of a significant environmental impact or if the matter was too inconsequential to warrant even the brief treatment required in an administrative record supportive of an agency's decision to refrain from filing an impact statement.

According to the uncontroverted backwater computation of the Corps of Engineers, the channel of Lost Creek has a capacity of 3000 cubic feet per second (cfs) in the area of the proposed lagoons. A Corps study presently under way in Columbus, Nebraska, estimates that the 100 year flood level of Lost Creek is 1700 to 2300 cfs in that area. Columbus is approximately sixteen miles upstream from the city of Schuyler. Proportionately, given the fact that the source of Lost Creek is ten miles above Columbus, it is entirely possible that the banks would overflow in the vicinity of the lagoons if extraordinary meteorological conditions developed. However, there is no suggestion that such a flood on Lost Creek would overtop the dikes surrounding the lagoons. The menace of a high water level is not nearly as great as that associated with a 100 year flood on the Platte River. Even more compelling is the fact that the Loup River Power Canal, located near Columbus, is capable of diverting waters from Lost Creek into the Platte River if conditions warrant such an action. This "safety valve" feature convinces the Court that the impact of a flood on Lost Creek alone would be of no environmental significance. While the EPA could have addressed the issue of Lost Creek flooding in its environmental impact appraisal, its failure to do so is, at the most, a technical failure to comply with the applicable regulations. The Court will not invoke the extraordinary remedy of equitable relief under such circumstances.

Another alleged deficiency raised by the plaintiff is the failure of the EPA to consider the environmental ramifications of locating the effluent lagoons so that the channel of Lost Creek is partially obstructed. Pokorny asserts that flooding will be more prevalent in times of high waters because this obstacle is partially within the "floodplain" of Lost Creek. The Court holds that no significant environmental impacts arise from the alleged enhancement of the risk of flooding. The calculations of the Corps of Engineers, based upon a cross-sectional of Lost Creek, demonstrate that the flow of 3,000 cfs is virtually the same whether the lagoons are there or not. While such calculations were not made at the time of the EPA's decision to proceed with the project without filing an EIS, the Court again holds that post-decisional evidence can be referred to for the limited purpose of deciding whether "substantial environmental issues" have been raised. The Court believes that the alleged "deficiencies" in the administrative record are not due to agency oversight, but instead to the insignificance of the asserted impact. All documents prepared by humans are deficient in one respect or another. This does not mean that all major federal projects should be enjoined if a resourceful and imaginative plaintiff can pinpoint a failure to address some minor environmental issue in a document that is, under the regulations, supposed to be brief in its analysis.

A further issue raised by the plaintiff is the capacity of the dikes to resist the erosive effects of moving flood waters. In particular, the plaintiff's expert witness questions the failure of the EPA to study the adequacy of "riprap" as a means of stemming the erosion of the dikes.

The Court holds that this concern is an engineering problem rather than an environmental question. The failure of the EPA to address such questions as the height, thickness or composition of "riprap" in the administrative record is not significant in the context of this lawsuit, especially when the regulations require that a negative declaration and an environmental impact appraisal must be issued before construction plan grants can be released. Detailed architectural plans are not typically in existence at the time of the agency's threshold environmental decision. A decision to "riprap" the side of a dike to avoid potential environmental impacts may obviate the need for the preparation of an EIS. The specific details with regard to the exact nature of the proposed protection would not be worked out until after the general agency conclusions about significant impacts had been made.

A comparison of the testimony of the respective experts on this issue demonstrates the propriety of denying injunctive relief. The plaintiff's engineer expressed reservations about the fact that the "riprap" did not extend low enough on the dike despite his admission that he had no experience in flood erosion prevention. Testimony from the EPA's expert, a hydrologic engineer, shows that a shield of "riprap" three feet high and twelve to eighteen inches thick, was sufficient to withstand a calculated maximum flow of 9 feet per second in the middle of a Lost Creek channel that could handle 3,000 cfs of water before overflowing. The Court agrees with the conclusion of the EPA's expert that the lagoon design adequately takes the Lost Creek flow into account.

A further concern voiced by the plaintiff in this suit is the adequacy of the bentonite seal that will cover the bottom and interior sides of the new cells. The plaintiff's expert raises the possibility of the creation of a hydrostatic head, destructive of the sealant's qualities, in the event of a prolonged flood where river waters maintain a level higher than the lagoon's contents. The resulting escape of the wastewater into the surrounding floodwaters is, in the eyes of the plaintiff, a significant degradation of the environment.

The Court again concludes that the problem is one of engineering rather than of the environment. The plaintiff's expert conceded that he had no opinion as to the probability of a hydrostatic boil in the bentonite seal. More importantly, there has been no demonstration of irreparable injury that would justify the issuance of an injunction, even if the wastewater were to escape during a time of very high floodwaters. The uncontroverted testimony of the engineer who prepared the facility plan demonstrates that the surrounding flood would be more polluted than the effluent within the lagoons. Because the escape of wastewater into the high waters outside of the cells would not cause a degradation of the environment, the impact would be insignificant and the preparation of an EIS would be unjustified.

Pokorny further challenges the validity of the EPA's failure to address the environmental significance of running pipes full of effluent underneath Lost Creek. This allegation fails to raise a substantial environmental issue. The pipes are to be buried five feet below the bottom of Lost Creek. The wastewater lines are three feet lower than two natural gas pipelines which presently are beneath the bed of the stream in the same area. An insignificant narrowing of the Lost Creek channel due to the location of these two new lagoons could not cause a sufficient scouring of the creek bottom to create a legitimate environmental concern. The design of the system clearly protects the effluent pipes from the remote and speculative possibility of line breakage through the deepening of the bed of Lost Creek.

The plaintiff's final environmental objection to the project involves a fear of an overdraw of effluent through the center pivot sprayer during the dry months of late summer, with a resulting application of insufficiently treated sewage on the alfalfa crop. This fear is unfounded. The EPA has kept informed on application rate data

throughout the life of this project. No evidence suggests that the center pivot system cannot be shut off if the sprayed liquid has received insufficient treatment.

After a searching evaluation of the plaintiff's environmental objections to the actions of the Environmental Protection Agency, the Court concludes that the decision to refrain from preparing an impact statement was reasonable.

An order in accordance with this memorandum opinion shall be filed contemporaneously herewith.